Our first case for argument today is 20-1758, Juno Therapeutics v. Kite Pharma. Mr. Rosencrantz, please proceed when you're ready. Thank you, Your Honor. Good morning. May it please the Court, Josh Rosencrantz, representing Kite. Your Honor, Juno achieved this massive $1.2 billion verdict through a combination of securing a patent that awarded it vastly more than it described or taught, impermissibly expanding a claim four and a half years after issuance, and a damages opinion that was manipulated to yield results that were many multiples of any reference license that Juno's own expert described as comparable. If you thought the patent was so horrible, then why did you try so hard to license it? Well, Your Honor, we tried to license it after the COC was issued, and of course you always try to mitigate risk, but that can't be held against us, certainly not on something like validity. And so this morning what I'd like to do is focus on the 112 issues and then turn to damages and maybe say a few words of time permits on the certificate collection. Well, before you get to that, can I just ask you how those all work together, what you described? We've got the written description, validity, and we've got the C of C. C of C is an infringement matter, and validity, obviously, we know. So what are you asking us for? I mean, if we were to affirm, to reverse on the certificate of correction, where does that leave us with validity contentions? Are they still on the table? Yes, they would be, Your Honor. I mean, the way this court typically addresses these issues is you start with validity. Validity would be a clear win for us if the patent is valid. So on that point, if we were to prevail hypothetically on the validity question, would that help get rid of the C of C question? Yes, Your Honor. There would be no reason for the court to address C of C. It's a much more fact-specific, case-specific issue. More specifically, and we'll let you get back into it in a second, more specifically with respect to what Judge Crowe said, you say the way the court typically does it, but often, part of what they'll say, what we care about is whether we infringe this patent. If we don't infringe it, we don't care about validity. So it's often waivable, and I think that's what we're trying to find out. Thank you, Your Honor. We would not be inclined to waive the validity question, but certainly this court has the option of addressing infringement and not addressing validity. How do we have that option under cardinal chemical and you raise counterclaims? I don't actually think we do have that option, sir. Fair enough. So we are not waiving validity. And I'd like to start with validity, because that is, just under this court's precedent, a clear winner. And just to underscore, it wasn't just written description, but also enablement, but I'll start with written description, because Juno does not even try to argue that it meets ARIAD. Let me ask you that. Sorry to keep interrupting, but that's what we're here for. We're out of practice, so we're a little excited about this. That's what I'm here for, Your Honor. Why is Juno repeatedly in his brief for saying that the common structural features of representative thesis sets of ARIAD is only for a new genius? Well, it seems true that the test is not only for a new genius. There's got to be some practical boundary for when we require examples and when we can rely on background knowledge of the person's skills in the art. So if we take the narrowest claims here, the ones against CD-19, what would be enough background knowledge to support these claims? Well, Your Honor, it would have to be vastly more than there was here. So here there were just four or five known CD-19 specific SCFDs. So that's five as compared to, for example, in Amgen. So Amgen 1 was the written description case. There were 26, and they were fully described. People knew the three-dimensional structure in Amgen. Here there were just five. Only two, only one actually, that had ever actually been attached to a car, and they were not at all described. CD-19 was not a fully described antigen. So you would need for... I mean, remember, these are pieces of... But the district court tells us that a lot of the stuff has been around for a very long time, dating back to the 90s and about. Sure, Your Honor. So this stuff, meaning SCFDs, antibodies have been around for vastly longer, yet this court in cases like CentiCorps and Amgen has held that even though antibodies are well known, you can't just announce that you have an antigen and then claim everything that binds to that antigen. This would be clearly impermissible just on that one claim element alone under this court's precedent. Take, for example, CentiCorps. Antibodies were really well known, and the patentee described an antibody that was from a mouse and an antibody that was chimeric, but not a human antibody. Here, Juno has claimed everything, including human antibodies, and they haven't even made a human antibody for seven years. And so let me just say a few more words about why Juno fails AREAD, and it's all based upon the undisputed record. Juno does not dispute the facts that would establish failure of written description under identical Boston Scientific Carnegie-Mellon. So first, the structural limitations in the narrowing claims describe a genus of millions of billions of potential candidates. That's undisputed, and it's candidates from any source. Second, only some unknown fraction of SCFDs in CARD satisfy the functional specific binding limitation that is binding to CD19. Not that any correlation would help, because the patent doesn't disclose even the structure of the one CD9-specific SCFD that it does mention, and the record is full of examples of CARDs that failed and SCFDs that failed. Counsel, when you're giving us these statistics and expressing how many options there are among small chain SCFDs that possibly could bind to the CD19 antigen on the surface of the cancer cell, that's all relevant to Claim 5, but isn't Claim 3 also an issue in this case? And Claim 3 is even much broader because it's not even just CD19. It's any antigen of any kind and any small chain SCFD that would then bind to any antigen of any kind. So that is correct. And let me start to quibble, but these are not small chains. These are actually really big chains. The SCFDs themselves are big chains. SCFD stands for small chain SC, right? Right. I just want to make sure I'm understanding this. Yes, you are. As compared to the rest of the CAR, it is smaller, or as compared to an antibody. But let me just... Okay, my clerk corrected us both. He says it's single chain SC. Is that right? Yes. Okay. But your point is well taken, Your Honor. They're claiming the ability to bind to anything. Whether that thing was even known at the time. The vast majority of cancer cells had no known antigens at the time. And I was saying the third item is that this is... Is there a testimony in the record to that effect? The vast majority of cancer cells had no known antigens at the time. Yes. Yes, Garcia testified to that, Your Honor. I don't suppose you know where in the record that is by any chance. I do. If you give me a moment. You could also just tell us on rebuttal if you want. Yeah, let me tell you on rebuttal. One of your helpers could come up with that for you. Hmm? One of your helpers could come up with that. No, I have it here. But one of the... But I do want to get out the third item, which is that it is highly unpredictable whether an SCFV or a CAR will specifically bind to the target CD9. So one of the questions or one of the issues that you raised, one of the pieces of evidence, was that Juno itself had tried more than a billion single-chain FVs and had only come up with 60 out of that billion that would be workable. Am I remembering those facts right? 60 out of the billion that that would actually bind specifically. Yes, that's correct. And by the way, that would not be only... Like bind to CD9. Yes, that's correct. 60 out of the billion they tried or 60 out of the billion that you say could possibly bind? No, no. There are millions of billions of possible candidates. They tried a billion human SCFVs and only 60 of those bound to CD19. How many sequences do you think would have to be disclosed? I mean, part of the problem here is that we have allowed genus claiming. So are we supposed to say that they have to disclose everything? Well, Your Honor, the court has never allowed genus claims to antibodies like this when they are so wildly unpredictable. And just bear in mind, the SCFVs are taken from components of antibodies. They are taken from the most variable components of antibodies. So how many would be hard to answer that question without knowing more about the specific antigen? So you would have to know tons about the antigen. You would have to know its structure. You would have to know a lot of things, and I would say in a very narrow range, that would bind to that antigen. Rather than a number, like in terms of how many, wouldn't the answer be if the patent taught, for example, the structural attributes of which ones would be likely to be the successful ones or which classes in particular? If the patent gave you a roadmap to being able to weed through the millions of billions, that would be the answer, right? Not 17 or 100 or 10,000 or whatever. It would have to be some sort of roadmap to allow a skilled artisan to identify them. Correct, Your Honor, and it would be very, very hard to do because the record here shows if you take an SCFV that binds, so clearly it was in the literature that bound, you change three amino acids and you all of a sudden have an SCFV that doesn't bind. These are highly variable SCFVs. Do you know why, in your view, things went so awry in this case? Based on your view, I know you complain about the jury instruction not being specific enough for this kind of case, but it seems like, in your view at least, on apportionment, on the damage of teeth, on the CFC, and certainly on the written description, the jury just misunderstood or didn't get it. Do you have a view on how things went down and why? Well, sure, Your Honor. I mean, when you get a jury verdict, excuse me, when you have a jury and the jury is not even told what the area of test is, and you put on an expert and said, well, all these structures were the same, when in fact the structures were not all the same. The structures of SCFVs are the same, but not that which defines the genus, which is the Chief Judge Moore's question about what specifics you would have to know. But is it really the honest answer that the patentee has such a great story here about your client being the bad guy and tricking the inventor into disclosing his information, and even though they thought they had the license, they didn't do it, and they went ahead anyway? I mean, it's a really good jury trial story, right? Well, Your Honor, so Jim had a story. We had a different story. But, yes, the jury could easily have decided that all of the rhetoric that has nothing to do with either written description or enablement or the validity of the COC was enough to persuade. And there was plenty of evidence to support the conclusion that there was willful infringement. So, Your Honor, we do challenge willful infringement, and in particular, whether you can call this egregious when you've invested in a drug and have very strong defenses, and ten months before you've got a market was the first time that the IPR was turned down. But I see I'm getting well into my time. No, we would like you to continue. This is a very complicated case, and we want to understand it. Can we go back for a second to the 60 of the billion that Juno tried that it found, the single-chain SVs that bound to CD19? How hard were those tests? And here's what I mean by that. For enablement purposes, you want us to find undue experimentation, and that's one of the pieces of evidence you point to is that this trial and error would have to occur a billion times to come up with the possible appropriate single-chain SVs. But my question is how hard is it? Is this like DNA sequencing where you turn the computer on at night and come back in the morning and it's all spit out on the spreadsheet? I mean, how hard? For you, you argued undue experimentation, and you want me to overturn a jury verdict that said it wasn't undue experimentation. What was presented in the way of evidence in this case about the level of complexity or the difficulty associated with performing these trial and error tests? So, Your Honor, it is very difficult to make a car. So it was described by Juno's expert as standard. Standard does not mean vast. The testimony on the date of priority, the testimony was that as of the date of priority, which is 2002, making a car, making an SCFV could take months to over a year. It's hard for me to believe. They tried a billion of them, and each one took months to over a year. That would be a billion years. Chief Judge Ward, that was 15 years later when the technology had developed vastly. So they were not taking a year per car. But by the way, as of the date of priority in 2002, and Juno's expert never disagreed with it, the testimony is 33,685, that it would take months to well over a year. And Juno's own expert said for a fully human SCFV, it is extremely difficult. That's the 33,955. That testimony was very cryptic. I mean, it's essentially a sentence without any basic foundation being laid for it. Right, so that's the problem. What Juno did here is what every patentee does in these 112 cases, in response to very specific testimony about how long it takes or how large the numbers are, they say things like, oh, it's not that big or it's standard. But they don't actually create a material. Yeah, but I read that expert testimony that you're relying on, and I didn't see much description or background foundation for why that opinion was expressed. He just simply said it. Well, so right, this was, I mean, the parties were crammed into a very short trial. His expert report explains, actually his testimony explains in significant detail what you have to do to create an SCFV. So to be clear, you have to first have an antibody. To create an antibody, you have to inject the antigen into the mouse, let's say. You're just focusing on mice. Then you don't have an SCFV from that. You wait several weeks for many, many antibodies to generate. Then you purify the antibody. Then you take that purified antibody and you have to clone it to sequence the DNA to get the amino acid. Right, it's a three-step process. Your point being it's a three-step process. Oh, it's way more than three steps. I've only described getting the small and large, excuse me, the two chains, the two variable chains of the antibody. You then have to take those and turn them into SCFVs. So you've got to decide the order and test that. You've got to decide the right linker. And that's before you get to putting it onto a car, which takes another several months to a year, according to the testimony here. And by the way, that billion, even 16 years later, took months to over a year. Can we talk about the certificate of corrections real quick? Okay. Can we just do that before you sit down? Yes, and if I may, I want to make sure to say just something about damages that the Corps will let me. But absolutely, I want to go over it once again. Okay, so the certificate of corrections issue. Now, the trial court found that you had a large hill to climb to overcome the jury's factual conclusion. And there was a lot of factual evidence about what a POSA would understand from this history. It's pretty clear they were trying to fix it and that they knew what the problem was. Why isn't that enough? Well, Your Honor, what you're talking about is the RCE. The RCE proposed three changes. It ends up at the end of the day following through with two of them, but not the third. But there's no explanation that would be clear to a person of skill as to why they didn't pursue that particular change, why they reinstated the sequence. Well, it looked to me like it was pretty obvious that whoever was doing the prosecution simply made a mistake and had the third RCE apply to the second application instead of the first one, which is what undid the sequencing change. I mean, why couldn't the jury accept that proposition? Because it isn't clear. I mean, as a matter of law, that would not be clear to a person of skill in the art because there are any number of other explanations, including an explanation that the district court gave on claim construction. So one of them could be Satterling's own articles for five years had exactly that same chain published. And so it could well be... When you say the same, you mean the original chain? Yeah, the chain as originally claimed in sequence ID number six. So a person of skill could easily have said, oh, wait a minute, the patent prosecutor got it wrong and realized that the articles were correct. They could have been doing it to avoid prior art, so that is to reinstate the COC, but excuse me, to reinstate that original sequence ID number six. But then there are all sorts of other clues throughout the patent that it was actually correct. And I just want to step back... But the trial court found that there were also clues the other way, and so it's up to the jury to weigh those clues, right? So agreed, Your Honor, the judge, there were clues in the other direction, and the question here is what's clear? And I know the parties have hit the court with a lot of detail, but that's exactly the point. The question here is whether any person of skill in the art would take one look at this patent and the prosecution history and say, aha, there's a mistake here. I know what it is, and I know exactly how to fix it. Well, what about the other point? By definition, there's a substantive difference between the as-claimed and as-corrected, right? Yes, Your Honor. So why are we spending so much time on what someone would figure out the mistake was versus saying whether or not something that creates a substantive difference could possibly be a minor correction? Well, so I agree with Your Honor on the question. Minor corrections under this court's law can change claim scope, but only if they are clear and only if the fix is clear. So all of these signs that Juno points to may make you question whether there's a mistake, but it doesn't tell you that the correct answer to this is to reinstate the RCE to the extent that it has not been fully implemented. Which claim? Clearly, under one, there's no infringement, and under the other, there is, or at least that's what the parties seem to consider. Yes, that is correct. So which claim is broader? So what Juno did was to broaden the claim because it encompasses more than, rather than encompassing a chain of amino acids of X length, it encompasses coding for a chain of amino acids of X length minus one. And so it embraces more. It goes from 114 to 113. It did not capture our product, and now it does capture our product, so it's broader. Can I ask you to back up for one more second? I want to go back to your claim that it would take months up to a year to come up with the single-chain RCE. There was testimony by Juno's expert, Brocker, I think his name was, that the Orlandi method was a cookbook, that was the word he used, a cookbook for making SVs. And then there was some, I remember some testimony somewhere, and the district court even cited it, about how some laboratory dishwasher was asked to make one and was able to readily make one. So what is your response? Is it that those things didn't occur in 2002 but were occurring 15 years later? Or what, because we are reviewing the evidence to find substantial evidence, it's not de novo assessing it on our own. So what would your response be to why it was improper for the district court to defer to that evidence? Well, so you're right, so Orlandi did predate the priority date, but Orlandi taught how to take an antibody that was already identified and then shear off the variable regions and connect them back together. It did not capture the universe of antibodies that had not yet been developed and therefore did not capture the universe. Well, CD19 had already developed antibodies in 2002? There were antibodies to CD19, there were only mouse antibodies, but there wasn't the full range of every possible antibody. The patent mentions only one. The art talks about another one. And the patent doesn't even disclose the amino acid sequence for the one it mentions. Correct. So you couldn't draw any structural correlation out of it. And to the extent that you would go to the literature and say, oh, it must be this one, the one in the literature was actually wrong, although it also wasn't the one that Juno had developed. And then secondly, the second answer to the court's question about Orlandi is that just because you have a cookbook, that was true in identics, in Boston Scientific, in Carnegie Mellon, and in Amgen. People knew how to make each of those possible candidates, but it took a while. So just because there was a cookbook that told you how to make it does not mean that it was at all fast. Okay. Okay, Mr. Rosenkranz, we need to hear from Mr. Chu. We will restore your rebuttal time. Your Honor. Oh, sit. Mr. Chu, obviously Mr. Rosenkranz went quite a bit over, and you don't worry about the time. You have the same luxury if you want. May it please the Court. Morgan Chu on behalf of Sloan Kettering and Juno Therapeutics. This case is about a pioneering invention from Sloan Kettering. The invention is the first living drug. It created a new paradigm for treating and, I would dare say, possibly curing cancer. What's the impact of the fact that you all were never able to implement it, never put it into practice? That is not the case. What happened is there were competing projects at Juno, and this project that was using the 190 technology was for a different indication, a very difficult disease to treat. It's adult leukemia. And what Juno decided was to put that on ice in turn to developing a treatment for the exact same indication. Now, it was using different technology. In addition, the 190 patent hardly failed at all. It had 56% of the patients in the clinical trial with positive results. But didn't the FDA shut down the clinical trial because of all the deaths? The FDA put it on hold because of some patient deaths, but they did not shut it down. And every one of these patients, there's testimony to the effect that, on average, they would die in 12 weeks because the scientists and physicians knew that this group of patients who were in clinical trials had failed every other kind of therapy. Now, the key to the invention was a new invented backbone, which is very specifically claimed. It's amino acids 114 to 220 in combination with CD3 Zeta. That is the inventive backbone that provides the therapy. But don't you claim more than just the backbone? Yes. A third part is the SCFD. You have to meet the utility requirement for a patent claim, and the SCFD is like a fastener. It's a means to bind to or attach to the antigen. And by the priority date of the patent, it was 15-year-old technology. It was very well developed. When you say it was 15-year-old technology, it was very well developed. People knew about SCFDs. They knew how to make SCFDs. My difficulty with your patent is that the claim says a binding element, that's the SCFD, that specifically interacts with a selected target. That would be the antigen. Yes. The problem is you haven't defined or given any sort of roadmap for how you would identify which SCFD might work with which antigen. There are many, many of each. Your patent feels a lot like saying people knew about antibiotics, people knew that there was bacteria out there. But what people didn't know is what antibiotics might work with what kind of bacteria. And there may be lots and lots of both. So your patent seems like it gave what was an idea but not clear guidance on how to solve the problem. There was a clear roadmap in the original patent application, and if one looks at column four, starting about line 52... Hold on, let me get to it. Column four. Yes. Starting at about line 52, it starts with the binding elements. And you'll see in the first several sentences, the patent fee says single-chain antibodies may be cloned from the B region, and it goes on. And then it says the production of such hybrid DOMAs, this is referring to the way to make SCFDs, has become routine, and the procedure will not be repeated here. Yes. No one is disputing that everyone at the time routinely knew how to make SCFDs. The problem is what your patent doesn't show the inventor possess is any way to identify which SCFDs are going to work with which antigens to bind to which. That's the problem. SCFDs are well-known. I read every piece of testimony in this record, and that's what they talked about, generalities, SCFDs being well-known. What they didn't talk about is which SCFDs or how to identify which SCFDs would work with any antigen, not even SC19. What the patent does describe is two representative examples, and in the prior, first of all. You said representative examples. Representative of what? Because the problem is even your two examples have no overlapping structural similarities, nor do they have any structural similarities with Yescarta. I don't know if I'm pronouncing it right. The SCFD used in the Juno product, it actually works. So when you say representative, representative of millions or billions of possibilities, but with no similarities that would draw one to a class of SCFDs that would be workable. So let me go to the evidence that addresses the question that Your Honor is raising. Dr. Brocker and Dr. Shadaline, who is one of the inventors, both testify. You want to give us an appendix site? Yes. Okay. Let me start with Dr. Brocker. 33932. Is it possible to identify which appendix it's in? Well, I'm identifying the page number. Hold on. It's the appendix. It's the first volume. What volume? Volume 2. 33932. Okay. In that page, Dr. Brocker is saying SCFDs were in the car field for more than a decade, nearly 15 years. Also, it's basically standard lab work, routine work. You can easily test. If you go two more pages, I'll give the last three digits because these pages all start with 33. So 934, Dr. Brocker says. One sec. So all this is is exactly what everyone has admitted, which is SCFDs were known. It was known how to make them. It was even known they could bind. So I'm hoping the next page you're going to direct me to is some way to identify, out of a billion possible SCFDs, which ones would bind to a particular antigen. Okay. Page 934 is where you want me to go? Well, let me just jump a page later. Which page? 935. 33935. Yes. And Dr. Brocker states that Dr. Garcia, the kite expert, was neglecting 40 years of science, 40 years of textbook knowledge. And then 938, he goes on. Stop, stop. I'm sorry. I mean, you're not actually helping. Okay. Page 935, he was neglecting 40 years of science. What does that mean? What am I supposed to take from that? Is that substantial evidence to the jury that you established and proved and demonstrated clearly that your patent taught how to identify which SCFDs would bind to which antigen? Yes. And let me go to some pages. By your expert, does someone else think he neglected 40 years of science is the specific testimony that is otherwise lacking? Okay. Let me, if I may, go to some more specific testimony where Dr. Brocker refers to the fact that the SCFDs maintain these structures in order to work as the binding element. That's 938. 938. What line? 938. Is there a line number? I can get that for you in a moment. I'm on page 938. Okay. And all he's talking about is how SCFDs have a common structure. This is much like saying an antibody has a common Y shape with, what is it, H and L? Yes, not yes, I got that right. Okay, H and L. So having a general, have an expert say all SCFDs, it's like saying a car has four wheels. You know, it's not, that doesn't do anything to tell you which SCFDs are going to bind to which antigens. It doesn't tell you anything about whether the structure of the one or two that you disclosed has certain common traits that make it capable of analogizing and identifying other SCFDs that would have a similar structure and work. This is just a generalized testimony. Let me address the court's question directly. Bear with me for a 30-second description of how the SCFDs over the 15 years before the priority date were created. A mammal is injected with an antigen. The mammal's own immune system makes antibodies. Yes, we know all this. You inject it in a mouth, it makes antibodies, you extract it, you purify it. We know that. Okay, and then the SCFD involves the two arms of the Y, the heavy and light chains. The structures were very well known, and they would bind to the antigen. All right, but your own expert says right here that not every SCFD has the same amino acid sequence because then they'd all recognize the same antigen. But you don't provide any sequence in here. Are you saying that everybody would know what sequences would bind to what? Let me address that directly based on a decision by this court. It's the K-PON decision. It's referring to the state of art on SCFDs in the 1990s, that at least by 1995, this court had decided to reverse a decision of the Board of Patent Appeals and Interferences, which found no written description with respect to SCFDs. And then the court said, you don't need to provide sequences because as of that time, it was so well known. The fact of an SCFD is so well known, but the problem for you in this case is everybody knew SCFDs, everybody knew they binded to things, everybody knew generally the structure of one, but what they didn't know is which ones, which kinds of amino acid sequences, would bind to specific targets. Your claims are very different from the case you just pointed me to. Your claims have functional limitations. Your SCFD has to bind to a specific target, and in Claim 5, it has to bind to CD19. The claims in the patent you were referring to didn't have anything like that. And so you have to disclose the full scope of your claim, which is the way in which we can identify SCFDs that will in fact bind to specific targets. In the Capon case, there was a specific question of whether sequences had to be disclosed, and it was directly addressed by this court in holding that specific SCFD sequences did not need to be disclosed. But there was no written description? There was no written description issue in that case, was there? There was. The Board of Patent Appeals and Interferences was having an interference. One was a patent application and one was an issued patent. And the Board held that the written description requirement was not met by either party. That was the exact issue on appeal in Capon. Was there actually a challenge to the written description finding? Yes. So what this court did was it reversed the BP, the Board's decision on written description, and remanded it. And here's what the court said. Mr. Chu, to be clear, I have no problem with that case or its holding in light, it was an interference in light of the counts that were issued in that claim, in that case. Your claim is quite different. And by the way, no one has suggested that the law requires you to identify a particular sequence. But the problem is you've identified no means in this claim for identifying structurally similar or functionally similar SCSBs or even CB19. You've given nothing. One way to do it may have been to disclose amino acid sequences. That might have been something you could have done to satisfy it. It's not required. Another way could have been that you identify structural similarities or particular groups of species within genuses or disclose a particular number of SCSBs that would otherwise make identifying the universe, the very broad universe of your claim, look as though it was in fact possessed by the inventor. But you did none of those things. So I don't think Judge O'Malley's question was meant to suggest that you had to disclose an amino acid sequence. I think Judge O'Malley's question was meant to point out that there are many ways in which you could have shown that your inventors possessed this very, very broad genus, but you didn't do any of them. Not you, but your point. In the trial record, Dr. Procker testified clearly several times, and I'll read part of one quote and direct you to the site. Please direct us to the site first. Okay. 33959. 33959. And if you start at about line 12, the question, you believe that SCSBs that fall within the scope of the claims have a common structure. Answer, all SCSBs have a common structure. This is very different from the... Yes, exactly. As the general statement says, that all antibodies have a Y shape. That's what he's saying. Generally, they do. All SCSBs do have a common structure. Absolutely. I don't believe Mr. Rosengrantz is going to stand up and dispute that when he stands up. But that's not the same as saying you disclosed enough for people to identify which one. But it was common, standard... Suppose I go to a car dealership, and I tell my children to pick up the car. And the car dealership has a lot of 1,000 cars on it. And I say, ah, well, mine is the car with four wheels. Every car has a common structure. It has four wheels. I haven't helped my children identify which car to drive off the lot. The science here is if you have a particular antigen and you want to bind to it, it was standard laboratory work to create the SCSBs. There were articles much earlier that addressed this. And why did it take Juno a billion tries to find 60 just for CD19? An antigen they already knew about. Two SCSBs of which they were already aware of. Why did it take them a billion tries? It didn't. If I can explain that article. It's the Stonemaier article. And this was an attempt to optimize SCSBs. And they were looking... The researchers said, hmm, how do we do this? And they took antibodies from 20 individual human beings. All of our bodies have tens, maybe hundreds of thousands of antibodies. Many of them are for targets where we don't know what the disease was. It could be many millennia ago. Those antibodies aren't used. So there are millions and millions or maybe billions of different antibodies. And then they went through some standard laboratory procedures. And they were focused on binding on a particular site only. It's identified as FMC63, well known in the literature. The Nicholson article from 1997 actually identifies that site. And they said, let's see which have elevated binding for that particular site. And what they found was, through this procedure, they discarded most of the billion. They did first assemble this large, I call it, a suit of possibility. But they quickly discarded it using standard laboratory procedures and quickly found 60 with elevated binding. And contrary to Kite's argument in the read, there wasn't a testing of a billion different ones. They quickly isolated 60 and they tested the binding affinity. So it's only testing 60. The billion that they assembled and the 60 they identified, did this take place 15 years after the patent? Yes. Yes. But Mr. Rosenkranz said that the evidence at the time was each one of these things took months, even a year. You're saying 15 years later, they assembled a billion of them and quickly, although you haven't given me a time frame, tested 60 of them. But that's not the technology that existed 15 years earlier in 2002. Mr. Rosenkranz's argument was hotly contested by actual testimony at trial by Dr. Brocker and Dr. Shadline. So for example, Dr. Shadline testified with respect to CD19 that he used upward of 30 different SCFDs and they all worked. At what point in time? He's referring to slightly later than the priority date as to when he was continuing to test and with respect to his car, his testimony was that he tested it with a multitude of different SCFDs. This is for different antigens. And they all worked. Dr. Brocker on the same subject. Going back to Dr. Brocker's testimony that we were talking about before, what he said is that if you change an amino acid within the sequence, it changes its binding ability or what it will bind to, correct? It could, yes. And so what you're talking about here is when you're testing, you're testing by playing with the amino acid sequence in a particular SCFD, right? Well, the article we were talking about was just focused on one epitope or binding site and looking only for elevated binding and testing those 60 and then the author said we found three had comparable binding to what had already been disclosed by the patent and the prior article. So they were trying to optimize and what they found was, well, of the 60 with elevated binding, the best of the rest, it was three with comparable binding. It was very easy to do. There was no elongated period of time. So you went backwards. Instead of saying let's identify the amino acid sequence that will bind to what we want it to bind to, then we're just going to just throw it out there and see if we can find one SCFD that might have the correct amino acid sequence, right? That's the basic science and Dr. Garcia agreed with that. How does that tell one of skill in the art how to do what you're doing? The Orlandi article was a recipe, a cookbook. It provided a roadmap for it. It was a well-known 1989 article. It is cited in the patent at column four, line 61. There was no dispute that it was a roadmap or a cookbook for making SCFDs that would bind to a particular target. But the targets aren't even known, right? You have covered any binding element that binds to any target. That's what you've covered in your claim. This claim three is remarkably broad and claim one is even broader. Any binding element that will bind to any target, right? If you look at the broadest claim, which would still require the amino acid sequence 114 to 220 in combination with 3D3 zeta, then yes, it could work with respect to other targeted antigens. When you say it could work, no. Your claim has covered any antigen, which is the target, and any SCFD. What incentive is there for any other company to do all the legwork that you all didn't do to come up with and identify both the antigen and then to identify the SCFD that will bind to that antigen and cure the various forms of cancer? It was very easy. If it was so easy, why isn't it all done already? Why don't we have? Why don't you have? It's so easy. Why doesn't your company have a million products that do this? Heck, why the heck doesn't Kite have a lot more than just Yescarta if it's so easy? I'm back to Dr. Sattelon where he created and tested with different SCFDs. We're talking about curing cancer. This is an amazing drug. It cures cancer. This isn't chemotherapy where you lose your hair. This is curing cancer, and it has been identified for non-Hodgkin's lymphoma in a small category, but it's so easy to identify the antigens and identify the SCFDs. Why haven't we cured all of the cancers? Let me address two parts of this. One is CD19, as I think the court had recognized. Five and 11, they're the narrower claims that are limited to CD19. The state of the knowledge was, at the time, included what's in the patent, the Orlando recipe, and also articles that were known in the prior art. Okay, so you're focusing on CD19, which I understand why. It's narrower. Does that mean you are now abandoning Claim 3 in light of that is one of the claims at issue, and that's the broader one, not limited to CD19. Remember, it's limited to any antigen and any finding agent. Let me just, if I may, answer the first part of what Your Honor was asking. As of the priority date, some people, other researchers, had focused and published on CD19. That's the 1995 Bajek article, the 1996 Kipriot article, the 1997 Nicholson article on CD19. Dr. Shadaland was asked whether he used different SDFBs targeting different antigens, and he testified he targeted a multitude of different antigens. This is at 32-917, and he said they all work. Dr. Brocker was asked about this subject, and he testified that he did not know of any that did not work when used in conjunction with a car. When I referred earlier and said, I think, could work, the question is whether the innovative backbone would be successful in working with particular tumor cells. It wasn't a question as to whether the SDFB would bind. It was well known among all scientists at the time that the SDFBs that were created in the cookbook recipe manner would, in fact, bind. Now, let me go to... I can go to other sites on... Can I just follow up with... In Greybreed, let me do page 12. Your friend makes the argument that your claims cover SDFBs from any source, including humans, SDFBs. But as of the priority date, there's no evidence that anyone has made a human CD19 SDFB. Is that correct? That is not true. And let me go through what the evidence is. There's a series of articles, in addition to Orlandi, that are cited in the patent. Number 31 at the bottom of column 13 is the Finney article. The Finney article was a human or humanized SDFB, obviously, as of the priority date. It's column 13 at the bottom, and the site number is 31 at the very bottom of that column. You see Finney? And it's a 1998 article that discusses human or humanized SDFBs. In addition, the Orlandi article also discussed human or humanized SDFBs. That was a 1997 article. The Byrd article from 1988, and I'll give you the site for that. Is that an answer? Discussing is the same as making the human CD19 SDFB? Yes. These are articles Finney and the others were making. So the Byrd article is referenced by Appendix 36165 and 66. Is Finney actually talking about SDFBs? Excuse me? Is Finney actually talking about SDFBs, or is it talking about CD20? Well, part of the article is talking about SDFBs. The articles frequently say, okay, we're going to try human or humanized SDFBs or cards that are human or humanized. And Dr. Brocker testified that human or humanized SDFBs have the exact same common structure,  as we talked about earlier, where there was a cryptic question and he starts out as Dr. Brocker saying, if you knew how difficult it is, the question is referring to humans. If you knew how difficult it is, it's extremely difficult, and then he cut off and he says, I can explain that if I can answer more than yes or no. Here's the explanation. There are ethical rules and lots of good rules that scientists have to jump through, and our society is particularly concerned about injecting human beings with antigens for obvious reasons. Is there a place in the appendix that you could refer us to this testimony? His testimony stops right where Judge O'Malley. He's sort of saying, I can explain this, but he doesn't go on. So everything you're doing right now is attempting to testify for an expert, stuff that he didn't testify to? What I just said in explaining the testimony, I'm explaining that. That's correct. That's not in the record. That's correct. Okay, let's move on from that. One of the problems I have is that when you're saying everybody knew how all of these STFEs had the same structure, or that any of them could be attached to a car backbone. Again, I'm pretty sure Mr. Rosenkranz isn't going to dispute either of those two points. I'm pretty sure he's going to stand up and say, however, what people didn't know is which ones. Yes, you could build a three-part car with any STFE, and yes, STFEs had similar structures, and yes, they could be used to form the car. But what you didn't know is then which of those would bind to which antigen. You would. It was all picked up in the following steps. The mammal's immune system is going to make the antibodies, and you take the heavy and light variable chains and you use that to make the STFEs. You get rid of the constant region, and you're using the same thing the antibody did to bind to the antigen. So it's going to work. It's going to work every time. It requires knowing in advance which STFE to use and knowing in advance which antigen you want to go after. You use any or all of the STFEs derived from the antibodies that bound to the antigen. That's answering the question with the answer to the question, in a way, or the question itself. The whole problem is nobody knew which STFEs were going to bind to the antigen. That's the problem. They did. No, you disclosed two, and the state of the prime market at the time knew four to five only, by the way, with regard to CD19. So for every antigen, so obviously there are other antigens not discussed in the patent, a scientist using routine procedures could get the mammal to produce antibodies. The antibodies would bind because the binding components of the antibodies become the STFEs. They would work. They work every time. And I want to come back. It works every time. So every time you can take any STFE of the billions that are out there, stick it on a car, and it's going to bind to any antigen. It's not billions. There's not billions of STFEs out there? Correct. Let me explain. There's not billions of STFEs? I don't believe so. Well, first of all, where does that testimony come from? Part of the source is Dr. Garcia, and what he did was to pretend in a theoretical way that you could take and replace amino acids one by one. So he did a math exercise. So if there's one amino acid, there are 20 possibilities. Okay. Didn't you tell me that Juno started with a billion STFEs? No. And I apologize. I was probably unclear. In the Sommermeier article, because they were starting with 20 human beings, they said, we'll take all of their antibodies for every current disease that any of the 20 have ever had or experienced and their ancestors over millennia may have experienced. And they were using that material, basically chopping it up and then saying, okay, we've got this big soup. Now let's see what is going to bind to this particular site. So they weren't creating a billion STFEs or testing a billion STFEs. They quickly threw away everything that didn't have some elevated binding. So as Dr. Brocker testified in response to Dr. Garcia's testimony, a person of skill in the art wouldn't do what Dr. Garcia was saying, which was to replace every amino acid position with the 19 other possible amino acids. He went on to testify that that wouldn't create anything useful in all likelihood because the proteins would degenerate and would degrade. So he was assuming that Dr. Garcia, let's say you have two amino acids, a really small string. You have 20 possibilities in each position. So that's 400, 3, 8,000. Did you put on any testimony rebutting that statement? Yes. Dr. Brocker directly rebutted it and made it very clear that no person of skill would do it that way. Dr. Garcia didn't say a person of skill would do it that way because a person of skill in the art would allow the immune system to make the antibodies and then create the SCFs. The SCFs are artificial in the sense that it's just part of the antibody, but it's exactly the part of the antibody that binds to the antigen. That's what they would do. That millions and billions by Dr. Garcia was just a math exercise.  I want to come back to human for just a moment. One sentence. This is, with due respect, a made-up argument on appeal. Dr. Garcia never discussed anything about human or humanized SCFs. He never told the jury that somehow it was difficult to deal with human or humanized and that because of that, it would violate the rules with respect to written description or enablement. Kite had plenty of other expert witnesses. Not a single one discussed human or humanized. Kite has a lot of scientists, PhDs. Not a single one said anything about difficulties of dealing with human or humanized. I want to turn to the certificate of correction issue. Sure. The first thing I want to do is, I think there might be a gap in our law, but everybody proceeds on the assumption that a clerical change and a typographical change can actually impact the substantive scope of a patent. But have we ever said that something that impacts the substantive scope, no matter which way, can constitute a minor correction? Let me separate the various COC issues. Oftentimes there's a certificate of correction, it's clear typo, no problem at all, no substantive effect. What this court has said, there are cases that could be a broadening of the claim. And this case could fit in that box because the actual sequence that the patentee tried to patent was amino acids 114 to 220. But I want to clarify. I'm trying to get to what the law says. And I would like to start with the statute. But you're putting your change in the box of minor correction, correct? No. I need to spend at least four or five sentences to explain. Well, there's three things in the statute, clerical, typographical, or a mistake of minor character. You're going with three, right? Yes. All right. So are you aware that the regulations implementing 252 and MPEP expressly say that while the first two can impact the scope of a claim, that it says that a mistake is not considered to be of minor character required for the issuance of a certificate of correction if the requested change would materially affect the scope or meaning of the patent? Either way, that's what both the regulations and the MPEP say. And the question is, has our case law ever said they disagree with those? I do not think your case law has disagreed with analogous facts to what we have here. The point I was trying to make is that this court's case law has said whatever little slot one puts it in, that if there is a broadening of the claims, then it has to meet other tests, which were part of the jury's... But you agree, though, that broadening or not, it does impact the material character of the claims, right? In this case? Yes. Yes, but it is because it was broadening. And the reason is the argument that Kite made at trial was that the claims covered 113 to 220 instead of 114 to 220. So you concede that the correction was broadening? Yes, because if it's 114 to 220, then you could add on other things, as opposed to if it's 113, it has to be narrower because you've added one amino acid. But I will point out, even before the request for continuing, before the RCE, so let me create the timing context. Doesn't the fact that you chose to use RCEs the first three times indicate that you didn't think this was fixable with the certificate of correction? I'm sorry. Isn't the mere fact that you chose to use RCEs the first three times, even though it was unsuccessful, doesn't that imply that you didn't think it was fixable with a mere COC? No, the patent had an issue. So it was still in prosecution. It was about to issue. The mistake was discovered. The RCE was then filed, and the extra nucleotides were crossed out. There was a scientific detailed explanation as to why those extra nucleotides shouldn't be there, why it is a mistake, why there was this clerical error. It's all laid out in the RCE. Let me just follow up on that. I mean, the goal here is public notice. The public has notice of what's been claimed. And you seem to use the fact that this was in the RCE and then didn't make it to your event. And I don't see, maybe we just do too much statutory interpretation and statutory construction here, but if you've got a statute and somebody proposed it in Congress or it was in the original bill and it gets deleted, you don't use that to say they must have included it. It suggests the reverse, that they intentionally didn't do it. So I'm perplexed by your argument that because it was in the RCE, but didn't get in, shows that it was intended to be there. I'm just not competing. It's not just the RCE. The original application, the claims is issued, refer to amino acids. So it's discussing the amino acid sequence. The specification of the patent in the original application refers to an amino acid sequence. When it refers to the amino acid sequence, it's 114 to 220. There's no ambiguity there. It also refers to particular primers, the primers you use to amplify a particular sequence. In fact, when Dr. Satterlein and Dr. Rosenberg were discussing Dr. Satterlein's invention and the subject of SCFEs came up, Dr. Satterlein said, here are the primers to use. So it's the best evidence. The primers, also in the original application, were being used for 114 to 220. This is before the RCE. So when the mistake was discovered, then the RCE was used to correct the mistake. Any person of skill reading that and the detailed explanation, seeing what was being, the extra nucleotides being crossed out, with the explanation why it was a mistake and the science behind it, all of that would have been understood by a skilled artisan without question. Now, you of course read that there was a mistake in the final listing. Yeah, that's what my question was about. That final step where it didn't make it in and you're using the fact that it was in the proposed RCE as somehow suggesting that the public should have had noticed, even though it was in the final step and I was confused about the rationale. So I do think the public would have noticed. Also, too, Kite was trying to license the patent before the certificate of correction. They were trying, this was in, opposing counsel was addressing the question, I think from Judge O'Malley. Kite tried to license the patent before the COC in the fall of 2013. This is testimony of Dr. Dash, who was a licensing person for Sloan Kettering and it's at appendix 33042. One of my problems with the certificate of correction is when I read the specification, I saw sort of confusing information as to whether it was meant to include 113 or meant to start at 114. In particular, what I'm talking about is column four versus column seven. Do you know what I'm referring to? Column four seems to suggest to someone that you were meaning to use 114, but column seven seems to suggest you were meaning to use 113. Is that fair? Is that a fair assessment? It's only column four and it's at line 24, excuse me, line 25, where the amino acid sequence is referred to as 114 to 220. Again, that's column four, line 25. And then there are references... Column four, line 25. I'm sorry, I must be on the wrong thing. It says 114 to 220, but what about column seven? Okay, column seven doesn't refer to amino acid sequences at all. Remember, the claim refers to the amino acid sequence. Instead, column seven is talking about some nucleotides. Yes, but the nucleotides correspond to the amino acid sequence, right? Well, they might, but the problem... It's like talking about a week or talking about seven days in a week, right? Talk about a week, people know it's seven days. It seems like the nucleotides 336 to 660 of CD28 are known to be 113 or... A person of skill in the art looking at the reference to nucleotides as opposed to amino acid would know that there was a mistake because the number... Okay, so you're saying they would know there's a mistake. Inherent in that is, yes, Judge Moore, column seven would suggest to someone 113, right? Is included? I actually would say that it wouldn't because the number of nucleotides must be divisible by three. And the fact is that it has four nucleotides at the beginning, making it not divisible by three. The question there is, is it the whole car that has seven nucleotides that are divisible by three or only this second part, which I don't remember the name of. This part has to be divisible by three. So the part we're talking about, it's called the costimulatory domain and that's the 114 to 220. So whatever the amino acids are there, expressed as amino acids or nucleotides, the nucleotides have to be divisible by three. There was testimony by Professor Quackenbush who said that his Harvard students... That's a tough name for an expert. Sorry, go ahead. I'm sure he loves his mom and dad for the name, but he would say he would give his students exercises and if someone responded with something other than was divisible by three, he would give them a failing grade. So a person of skill looking at this would say, it's got to be wrong because it's not divisible by three. And then there's the other error in the reference to the nucleotides because the last three nucleotides are what's called a stop codon. It says no need to code anymore and you wouldn't include the stop codon in a nucleotide listing because it's just not part of it. So a person of skill who is just looking at the nucleotides and not looking at the rest of the prosecution history or the rest of the patent would say, that's a mistake. The nucleotide listing is a mistake. It would be clearly evident to one of ordinary skill. Okay, I think that we're for sure out of time at this point. Thank you, Mr. Hsu. Let's give Mr. Rosenkranz his full four minutes of rebuttal. Thank you very much, Ellen. So a lot to respond to, but I'll make just four points. First, to answer Chief Judge Moore's question about the unknown antigens, Garcia did say it at 33.677 at the bottom of the page, but the two inventors said it too. At 32.993, that's satellite, and at 26.411, that's Brenton's. And I'll quote, a whole piece of research still has to be done today to identify suitable targets for solid tumors for CAR-T therapy. That's the inventors Satellin and Brenton's. It says, quote, finding ideal target antigens for cancer, certainly in solid tumors, is a difficult chore and will require much more work on our part. Second, Chief Judge Moore, you are exactly right. The 190 patent gave an idea about how to use an SCFB as a binding element in a CAR, but from there, a skilled artisan has huge amounts of research to do in order to figure out which ones will work. You also asked for an established correlation between structure and function. There is a killer quote from Dr. Brocker, Juno's own expert, that there was no established correlation. That's at 33.955C. It's at the end of volume two. He says, the patent does not, quote, teach any correlation between amino acid sequence of an SCFB and its ability to bind to a target antigen. And, of course, because it's so unpredictable. Third, Chief Judge Moore, you also hit on what I think is... Mr. Chu is concerned about the court potentially running into problems with its own precedent if it were to say that they had to have disclosed the amino acid sequence, for example, of the two SCFEs that it had in fact... Oh, so Yara Keepon is very clear on this. There is no requirement that you disclose the full amino acid sequence if the amino acid sequence is published elsewhere. But there's a regulation that requires you to publish an amino acid or DNA sequence if you're going to claim it. But our point is... Wouldn't your point in this case be even broader? Even if the two sequences were disclosed, unless there was evidence that those sequences had within them something that taught a skilled artisan how to identify other sequences, it still wouldn't be enough. Exactly, Your Honor. And that's the point I was just going to make, which is that's not representative of the millions of billions that allow you to envision the full genus. And that really is... You're making, Your Honor, the point that is... I think that the key to this dispute that genome tries to avoid, these claims create or they recite a function. And it's the FCFB that provides the function. Just look at the claim itself. This is not some mechanical component. Mr. Chu called it a fastener. It's not a mechanical component that you plug and play. The claim is to a single chain. It's to a long chain of genetic material. And it encodes a single thing, which is a protein, with segments that interact with one another. The only claimed function in this entire patent is the specific binding function, and that is performed by the FCFB. And everything that happens down chain is triggered by the FCFB. Third, the Sotomayor article about the billion, the only expert testimony in this record about that billion candidates... Am I right? I mean, I kind of put a lot of words in your mouth and you're out of time, but at least answer me this question. Was there anything that I said where I think... When I said, well, I think even Mr. Rosenkranz would agree with that. Did I say anything that you don't agree with, which I attributed to you as agreeing with? Everything you said that you attributed to me as agreeing with? Yes, those are table stakes in all written description or 112. But for example, things like FCFBs were well known. How to make FCFBs were well known. The fact even that Mr. Brockert testified that now in light of this car backbone structure, any FCFB could be attached to the car. The real issue, it seems to me, is in the binding to a specific target. Correct. Is that the problem? That is the problem. Those other things were either well known or sufficiently taught by this patent. But what isn't taught by this patent is which FCFBs will bind to which target. That is correct. And then when you put them in cars, whether they will continue to bind. That was also not known back in 2002. And the reason I said this is table stakes is because the same arguments were made in identics. I mean, everyone knew how to make a nucleoside. That was the clear testimony we did. Give me a structure, I know how to make it. Or Boston Scientific, everyone knew how to make those macrocyclic rings. Or Carnegie Mellon. Or Amgen. Everyone knows how to make antibodies. Last point on 112. As Chief Judge Moore said, if it was so easy for Juno to do this, Juno would have done it. And it would have done it 19 years earlier than it ended up doing it. Mr. Chu talked about CD19. Juno tried to make a CD19-specific FCFB with the 190 patent, and it failed. It transferred to another technology. If I may say one last thing on... Can I just... I just want to make sure that I'm right. Mr. Chu is correct, is he not, that there is specific testimony in the record that the licensing efforts occurred before the correction. And that your statement to me that that wasn't true assumes that we disbelieve the testimony from Sloan Kettering. Your Honor, there was no testimony that... I'm sorry. That is correct. You would have to disbelieve the testimony of the Juno executive who said there were licensing conversations going on before that. But the only evidence in the record other than that is actually an inquiry about collaboration on immunotherapy, and then Juno reaching out to talk about a license, an email to which... to which our inventor never responded. Let me just make one last point about the COC, and it's the Chief Judge Moore talks about confusing information. This is all a jumble of confusion. A broadening COC is supposed to be about obvious errors, typos right on the face of the patent. The burden should be on the inventor to state the meets and bounds of his invention clearly. The burden shouldn't be on the public to try to parse through dense text and figure out, like... I'll stare at an RCE, compare the amino acid sequences, realize that there is a discrepancy, and then figure out what it is. And to answer Judge Romali's question about this court's law, the answer is no. If a broadening... that a broadening correction cannot be of minor character, Superior Fireplace says that, that a broadening amendment cannot be minor. And so if there are no further questions, we respectfully request that the court reverse. Okay, we thank both counsel for the argument. It was very helpful, and thank you very much. Let's move on to our next case.